## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ANTHONY LEPORE, JOHN RIFE,
and BRIAN DOMALIK,

Defendants.

1:15-cr-00367-WSD

## OPINION AND ORDER

This matter is before the Court on the Government's request to elicit

testimony from Andrea Kiehl ("Kiehl"), Diversified Maintenance

Systems' ("DMS") former General Counsel, about Defendant Anthony Lepore's

("Lepore") allegedly false statements and omissions to her.  Also before the Court

is the Government's request to elicit testimony from Kiehl about a WSB-TV news

report of a government investigation into Rite Way Services, Inc. ("Rite Way").

## I.      BACKGROUND

On July 13, 2016, the Government filed its First Omnibus Motion in Limine

to Admit Evidence at Trial [106], seeking to admit evidence of Lepore's "material

misrepresentations" during negotiations to sell Rite Way to DMS.  ([106] at 12).

On August 22, 2016, the Government filed its Notice of Intent to Introduce

Evidence [sic] Rule 404(b) [157], stating the Government intends to introduce evidence of Lepore's "false statements and omissions" to Kiehl and DMS CEO Alan Butcher ("Butcher").  ([157.1] at 2).  On August 25, 2016, the Court denied [167] the Government's motion without prejudice because the Government did not identify the specific misrepresentations it sought to introduce.  ([167] at 27).  The Court directed the Government to proffer, at trial, all of the misrepresentations, by Lepore to DMS, that the Government seeks to introduce.  ([167] at 27).  The Government has not moved to introduce evidence of misrepresentations made to DMS by Defendants John Rife ("Rife") or Brian Domalik ("Domalik").[1]

On September 16, 2016, the Government provided the Court with a written description of Kiehl's expected testimony about the WSB-TV news report and Lepore's allegedly false statements and omissions to her.  The Government expects Kiehl to testify that:

---

[1]     The Government expects Kiehl to testify about her discussions with Domalik and Rife.  ([198] at 6-7).  The Court will address, at trial, any objections to this testimony.  The Court addresses, in this Opinion and Order, some of Kiehl's expected testimony about her conversations with Rife.

- "Kiehl first found out about an investigation involving Rite Way customer GWCCA after a local news story aired in the fall of 2013, and Lepore notified Kiehl and DMS CEO Alan Butcher about it.  Kiehl and Butcher called Lepore, who characterized the issue as merely a contract issue between Rite Way and the GWCCA involving an overpayment to Rite Way concerning some chemicals, and the contention that Rite Way owed the GWCCA money."  Lepore did not state that the Georgia Bureau of Investigation ("GBI") investigation involved criminal matters.

- In the telephone conversation, Lepore told Kiehl and Butcher that "he had just found out for the first time, the night before, that Domalik had been pulled over by the GBI and interviewed, and that 4 other Rite Way employees had also been interviewed by the GBI about the situation."

- "Kiehl then watched the news story herself, which discussed 'kickbacks' and made it clear that it was a criminal investigation.  Still, however, based on the limited information in the news story and what she was being told by Lepore, Kiehl did not appreciate that Rite Way or any of its officers or employees were a focus or subject of any criminal investigation, given that the story concerned a contract dispute and kickbacks involving the GWCCA and one of its subcontractors."

- When Kiehl later "found out about the apartment" that Rite Way provided to a public official, and asked Lepore "what he thought it was for," Lepore said "something along the lines of 'we have corporate apartments that the company uses, it's cheaper to have corporate apartments for Rite Way managers to use when they are traveling.'" "Lepore made it seem to her that the apartment was for the company. Kiehl confronted Lepore again later about the apartment, closer to the March 19, 2014 closing date, and he was adamant that he just thought that the apartment was for Rite Way managers."

- "At a dinner with Kiehl and Butcher during th[e] pre-March 2014 period, Rife discussed the TV news story with them but omitted that Cecil Clark had been approached by the GBI months earlier in reference to the apartment for Jackson."

3

- "Within days of the issuance of the federal grand jury subpoena to Rite Way, Kiehl received a copy of it from Rite Way's outside counsel, she discussed it with Lepore on the telephone, and she was assured by Rite Way's outside counsel that any and all preservation efforts were being undertaken by Rite Way."

(See [198] at 5-7).[2]

The Government seeks to introduce Lepore's allegedly false statements to Kiehl as evidence of his consciousness of guilt.  ([106] at 12; [156] at 19).  The Government seeks to introduce Kiehl's testimony about the WSB-TV news report as "relevant to helping [Kiehl] remember or recall in [her] mind[] or chronologically when things happened."  ([206] at 29:1-3).

## II.     LEPORE'S ALLEGED MISREPRESENTATIONS TO KIEHL

False exculpatory statements may be used as evidence of consciousness of guilt.  See United States v. Alejandro, 118 F.3d 1518, 1521 (11th Cir. 1997); United States v. Holbert, 578 F.2d 128, 129 (5th Cir. 1978); Seeman v. United States, 96 F.2d 732, 733 (5th Cir. 1938) ("It is well settled that any act or statement of the accused tending to show consciousness of guilt is admissible in evidence

---

[2]      The Government's proffer is set forth in the Government's Corrected Response in Opposition to Defendant Domalik's Motion in Limine to Preclude the Introduction of Privileged Communications.  ([198] at 5-7).

against him, to be considered together with the other evidence in the case.  This

applies to false statements by the accused in attempting to explain proven facts.").[3]

> When a defendant voluntarily offers an explanation or makes some
> statement tending to establish his innocence or her innocence, and
> such explanation or statement is later shown to be false in whole or in
> part, the Jury may consider whether this circumstantial evidence
> points to a consciousness of guilt.  It is reasonable to infer that an
> innocent person does not ordinarily find it necessary to invent or
> fabricate a voluntary explanation or statement tending to establish his
> innocence.  Whether or not evidence as to a defendant's voluntary
> explanation or statement points to a consciousness of guilt and the
> significance, if any, to be attached to any such evidence, are matters
> for determination by the Jury.

United States v. Pringle, 576 F.2d 1114, 1120 n.6 (5th Cir. 1978); see United

States v. Barresi, 601 F.2d 193, 194-95 (5th Cir. 1979).

False exculpatory statements suggesting guilt are typically offered to police

or other investigating officials.  See, e.g., Vu, 378 F. App'x at 909 ("[I]t is

reasonable for the jury to infer that a defendant's false statement to police

demonstrates a consciousness of guilt."); United States v. Jernigan, 341 F.3d 1273,

1279 (11th Cir. 2003) (finding it "reasonable to infer from the fact that Jernigan

initially gave the arresting officers a false name that he was attempting to conceal

his identity as a felon to avoid a prosecution for being a felon in possession of a

---

[3]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the
Eleventh Circuit adopted as binding precedent all decisions handed down by the
former Fifth Circuit before October 1, 1981.

firearm, and that this effort evidences a consciousness that Jernigan in fact possessed the gun found in his truck"); United States v. Chaney, 446 F.2d 571, 576 (3d Cir. 1971) ("[E]xculpatory statements made upon interrogation with intent to divert suspicion or mislead the police, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").

In Alejandro, the defendant was charged with possession of, and intent to transfer, false identification documents. 118 F.3d at 1520. In an interview with the Immigration and Naturalization Service, the defendant initially denied that he knowingly possessed the documents. He later admitted knowing of the possession but denied having the intent to transfer. The court held that "[t]he jury could . . . properly consider [defendant's] false exculpatory statements upon his arrest as substantive evidence of his guilty intent." Id. at 1521; see also United States v. Vu, 378 F. App'x 908, 910 (11th Cir. 2010) ("[T]he jury was entitled to consider Vu's initial false statement [to police] that he had thrown a baseball bat [instead of a firearm] over the fence as evidence of his knowing possession of a firearm.").

A.     Lepore's Fall 2013, Statements about the Scope of the Investigation

Lepore's fall 2013, statements to Kiehl and Butcher about the scope of the GBI investigation—that it "merely" involved a "contract issue" and that Domalik

6

and others were interviewed by the GBI—do not suggest a consciousness of guilt.

"Sometimes the evidence [of false exculpatory statements] is excludable because a

necessary inference is implausible under the circumstances."  1 Christopher B.

Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:4 (4th ed. May 2016

Update).  Lepore's statements about the scope of the investigation did not

constitute representations about the facts underlying the alleged offenses or his

involvement in those offenses.  See United States v. Littlefield, 840 F.2d 143, 149

(1st Cir. 1988) ("For an allegedly false exculpatory statement to be of any value in

the factfinder's deliberations, we think it either must involve a matter collateral to

the facts establishing guilt or should be so incredible that its very implausibility

suggests that it was created to conceal guilt." (citations omitted)); Mueller &

Kirkpatrick, Federal Evidence § 4:4 (false exculpatory statements should be

"closely related to the crime charged," such as "a statement denying an element of

the crime").  "Typical of the statements admitted to show guilty mind are false

claims of alibi, denials of presence at the scene of the crime, false claims of

identity, false explanations of activities, false explanations of possession of goods

and other objects, and false denials of acquaintance with others involved in the

crime."  Mueller & Kirkpatrick, Federal Evidence § 4:4.  Lepore's statements

about the scope of the GBI investigation do not fit into these categories, and had no bearing on the likelihood of his conviction.

It was Lepore who first disclosed the GBI investigation to Kiehl and Butcher.  Lepore disclosed further that interviews had been conducted in a way characteristic of criminal investigations.  The statements themselves were true and disclosed the investigation was being conducted by a criminal investigation agency.[4]  Lepore did not deny personal culpability, did not deny an element of a criminal offense or make a comment inconsistent with guilt, and thus did not make a false exculpatory statement which is admissible.[5]

B.    Lepore's Statements about the Apartment

When Kiehl approached Lepore about the apartment allegedly paid for by Rite Way, Lepore said he believed "the apartment was for Rite Way managers." ([198] at 5-6).  The Government has introduced evidence contradicting this

---

[4]    The GBI is widely known as the state agency responsible for criminal investigations and is the state counterpart to the Federal Bureau of Investigation.

[5]    Lepore also had a strong motive to downplay the investigation regardless of his guilt because he was trying to sell Rite Way, where he was a co-owner, to DMS, where Kiehl worked as General Counsel.  Cf. Mueller & Kirkpatrick, Federal Evidence § 4:4 (the relevance of false exculpatory statements increases where "the only likely explanation [for the statement] is to avoid being charged or convicted").  Lepore's alleged misrepresentations were made to a potential business investor and bore on the likelihood and nature of any investment.  This further undermines any inference of his consciousness of guilt.

exculpatory assertion, and Kiehl's testimony about the statement is admitted to show his consciousness of guilt.  The statement is relevant because the jury could conclude (1) that Lepore lied about how the apartment was used, and (2) that he did so because he believed Rite Way's actual use of the apartment was unlawful and wanted to avoid detection by investigating government officials.  The statement is not hearsay because it is not offered for the truth of the matter asserted and, even it was, it is a statement of a party opponent.  See Fed. R. Evid. 801(c)(2), (d)(2)(A).

      C.     Rite Way's Statements about its Preservation Efforts

The Government alleges that Rite Way's outside counsel told Kiehl, after a subpoena was issued to Rite Way, that "any and all preservation efforts were being undertaken by Rite Way."  ([198] at 7).  Lepore was on this phone call, but did not make the statement.  The statement, made by Rite Way's outside counsel, does not suggest that Lepore believed he committed an offense or engaged in wrongdoing.

To the extent the Government seeks to introduce this conversation to show that Lepore failed to disclose his alleged efforts to delete his company email, the conversation also is inadmissible.  Verbal omissions rarely suggest a consciousness of guilt.  The few cases involving omissions are based on conversations with investigating officials and often involve direct questions that clearly call for

disclosure of the information.  See, e.g., Chaney, 446 F.2d at 575 (in an FBI interview, defendant failed to say he was with the co-conspirators on the day of the bank robbery); S.E.C. v. Rubin, No. 91-cv-6531, 1993 WL 405428, at *2 (S.D.N.Y. Oct. 8, 1993) (when the National Association of Securities Dealers asked defendant to provide the basis for his trading behavior, he omitted from his response any reference to market rumors, even though defendant admitted at trial that they played a role; the "the jury could have inferred that he omitted reference to rumors because any follow-up inquiry about sources of such rumors, actual or potential, might have disclosed his relationship with [his inside source], and that that omission betrayed consciousness of guilt").

The conversation here was between Rite Way's outside counsel and a potential private purchaser of Rite Way's business.  Rite Way's outside counsel was speaking about a general action taken by Rite Way and did not include a representation about any particular employee, including Lepore.  The Government has not alleged that Lepore was asked directly about his compliance with the subpoena or his preservation efforts.  Lepore's alleged omission is not admissible to show his consciousness of guilt.[6]

---

[6]      The Government also seeks to elicit testimony from Kiehl that Lepore "was calm and did not react in an emotional way" after she told him that DMS would

### III.   WSB-TV NEWS REPORT

The Court previously excluded the content of the WSB-TV news report (the "Report") as irrelevant and prejudicial.  ([167] at 10-11).  The Government now seeks to introduce Kiehl's testimony about the Report as "relevant to helping [Kiehl] remember or recall in [her] mind[] or chronologically when things happened."  ([206] at 29:1-3).  This proffered purpose does not persuade the Court that introduction of all or a portion of the Report should be permitted even for this limited purpose.  The Government may use other methods or events to "help[] [Kiehl] remember or recall . . . chronologically when things happened," if necessary.

The Government seeks to elicit testimony from Kiehl on three specific issues involving the Report.  First, Lepore spoke to Kiehl about the scope of the investigation as a result of, and after notifying her of, the Report.  Evidence related to an admissible statement is sometimes allowed to explain or provide context for the statement.  See Mueller & Kirkpatrick, Federal Evidence § 4:2 ("Circumstantial evidence that provides . . . background may be relevant if it

---

only proceed with the acquisition of Rite Way if the transaction was restructured as an asset purchase.  ([198] at 7).  This testimony is excluded as irrelevant.  That Lepore reacted calmly to a change in the structure of the acquisition does not suggest a consciousness of guilt.

11

throws other evidence into sharper relief, helps clarify or explain it, or makes it more vivid or real.").[7]  Because the Court already has concluded Lepore's statements about the investigation are irrelevant, the context for those statements also is irrelevant.  The Report is not necessary for Kiehl to testify about her conversation with Lepore, and does not overcome the Court's ruling that the Report, even if allowed for some limited purpose, is required to be excluded.

Second, the Government seeks to elicit testimony from Kiehl that, after she spoke with Lepore about the GBI investigation, she watched the Report, which discussed "kickbacks," and concluded the investigation was criminal.  This testimony is excluded.  Kiehl's reaction to the Report is not probative of any fact of consequence, see Fed. R. Evid. 401, and the content of the report already has been excluded.

Third, the Government seeks Kiehl to testify that Rife "discussed" the Report with her and Butcher, at a dinner, and that Rife "omitted that Cecil Clark

---

[7]     See also Conway v. Chem. Leaman Tank Lines, Inc., 525 F.2d 927, 930 (5th Cir. 1976) ("The policy of the [Federal Rules of Evidence] is one of broad admissibility, and the generous definition of 'relevant evidence' in Rule 401 was specifically intended to provide that background evidence . . . is admissible."), on reh'g, 540 F.2d 837 (5th Cir. 1976); Paul F. Rothstein, Federal Rules of Evidence Rule 401 (3d ed. Dec. 2015) ("Evidence whose only function is to enable the jury to place the parties and events against a background may not precisely fit the words of the Rule, but is nonetheless liberally allowed.").

had been approached by the GBI months earlier in reference to the apartment for

Jackson." ([198] at 7).  This "omission" does not qualify as an exculpatory

misrepresentation.  The Report did not mention Rite Way's apartment payments or

Rite Way's direct payments to a public official, and the Government has not

provided any specific information about the discussion that would render Rife's

alleged omission suspicious.  The omission also is not admissible because it would

confuse or mislead the jury and its prejudicial effect would substantially outweigh

its doubtful probative value.  Fed. R. Evid. 403.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Government's request to admit

Andrea Kiehl's ("Kiehl") testimony about certain of her conversations with

Defendant Anthony Lepore ("Lepore") is **GRANTED IN PART** and **DENIED IN**

**PART**.  It is **GRANTED** to the extent that the Government may elicit testimony

from Kiehl that Lepore told her the apartment, provided by Rite Way Services Inc.

to Patrick Jackson, was only for Rite Way managers.  It is **DENIED** with respect

to the Government's request to elicit testimony from Kiehl about (1) her

conversation with Lepore, in the fall of 2013, concerning the scope of the GBI

investigation, and (2) her telephone conversation with Lepore and Rite Way's

13

outside counsel, in which Lepore failed to state that he took action to delete his company email.

**IT IS FURTHER ORDERED** that the Government's request to admit Andrea Kiehl's testimony about the WSB-TV news report is **DENIED**.

**SO ORDERED** this 19th day of September, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

14